1

2   WO

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                          **FOR THE DISTRICT OF ARIZONA**

8

9   Chris Slavick,                              No.  CV-21-00208-PHX-JAT (JZB)

10                    Plaintiff,

11  v.                                          **ORDER**

12  M. Frink, et al.,

13                    Defendants.

14

15          Pro se Plaintiff Chris Slavick, who is currently confined in the Halawa Correctional

16  Facility in Aiea, Hawaii, brought this civil rights action pursuant to 42 U.S.C. § 1983.

17  Defendant Case Manager C. Narvaez moves for summary judgment on the merits of

18  Plaintiff's Eighth Amendment excessive force claim.  (Doc. 35.)  Plaintiff was informed of

19  his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th

20  Cir. 1998) (en banc) (Doc. 40), and he opposes the Motion.  (Doc. 48.)  Defendant filed a

21  Reply.  (Doc. 49.)

22          The Court will deny the Motion for Summary Judgment.

23  **I.     Background**

24          As relevant here, in the Complaint, Plaintiff alleges that on February 6, 2019, while

25  he was in custody at the Saguaro Correctional Center, another prisoner assaulted him, and

26  Plaintiff suffered a neck injury and damage to the C4-C5 discs.  (Doc. 1 at 4.)[1]  Plaintiff

27  _____

28          [1] Plaintiff was in custody at the Halawa Correctional Facility when he filed the
    Complaint on February 8, 2021.  (Doc. 1.)

JL

1    claims that on May 6, 2020, an unidentified officer forcefully handcuffed Plaintiff with his
2    hands behind his back "in a painful position," despite knowing Plaintiff had serious
3    physical injuries to his left shoulder, left foot and ankle, and right hand.  (*Id.* at 7.)  Plaintiff
4    claims Defendant Narvaez was "present and involved" and that both Defendant Narvaez
5    and the unidentified officer "continuously shoved [Plaintiff] forward onto [his] left
6    foot/ankle while pulling [his] left shoulder back and bending [his] fingers on both hands,"
7    while "mock[ing] [Plaintiff's] apprisals [sic] to them of the serious pain that they were
8    inflicting." (*Id.*)  Plaintiff asserts that from the "HC module to the medical unit," Defendant
9    Narvaez and the unidentified officer assaulted him and mocked his severe injuries and the
10   pain they were inflicting.  (*Id.*)  Plaintiff alleges that medical staff informed Defendant
11   Narvaez and the other officer that Plaintiff's "serious injuries were valid/documented and
12   told to transport [Plaintiff] in a wheelchair." (*Id.*)  Plaintiff asserts "[e]xtreme pain was
13   inflicted to [his] right hand/wrist (fractured/dislocated condition), left foot and ankle as
14   weight was repeatedly forced down upon it, and left shoulder." (*Id.*)

15           On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated
16   an Eighth Amendment excessive force claim in Count Four against Defendant Narvaez and
17   directed him to answer the claim.  (Doc. 8.)  The Court dismissed the remaining claims and
18   Defendants.  (*Id.*)

19           On February 17, 2023, Defendant filed a Motion to Dismiss for Lack of Prosecution
20   and the instant Motion for Summary Judgment.  (Docs. 34, 35.)  In the Motion for Summary
21   Judgment, Defendant asserted that Plaintiff failed to exhaust administrative remedies
22   before he filed the Complaint in this case and argued that Plaintiff's Eighth Amendment
23   claim fails on the merits.  (Doc. 35.)  In an August 3, 2023 Order, the Court denied
24   Defendant's Motion to Dismiss for Lack of Prosecution and denied the Motion for
25   Summary Judgment as to exhaustion.  (Doc. 52.)  The Court declined to rule on the merits
26   of Plaintiff's claims at that time and directed Defendant to file either a motion for an
27   evidentiary hearing regarding exhaustion or a motion to withdraw the non-exhaustion
28   argument.  (*Id.*)  On August 17, 2023, Defendant filed a Motion to Withdraw the non-

1  exhaustion argument and asks the Court to rule on his Motion for Summary Judgment on

2  the merits of Plaintiff's Eighth Amendment claim.  (Doc. 53.)

3  **II.      Summary Judgment Standard**

4        A court must grant summary judgment "if the movant shows that there is no genuine

5  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

6  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The

7  movant bears the initial responsibility of presenting the basis for its motion and identifying

8  those portions of the record, together with affidavits, if any, that it believes demonstrate

9  the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

10        If the movant fails to carry its initial burden of production, the nonmovant need not

11  produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099,

12  1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts

13  to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

14  contention is material, i.e., a fact that might affect the outcome of the suit under the

15  governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

16  jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

17  242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

18  Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

19  favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

20  it must "come forward with specific facts showing that there is a genuine issue for trial."

21  *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

22  citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

23        At summary judgment, the judge's function is not to weigh the evidence and

24  determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,

25  477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw

26  all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited

27  materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

28  . . . .

III.     Facts

Plaintiff is a Hawaii Department of Public Safety prisoner who was in custody at SCC from November 18, 2018 to August 5, 2020.  (Def.'s Statement of Facts (DSOF), Doc. 36 at 1 ¶ 1.)  At approximately 1:00 p.m. on May 6, 2020, Plaintiff was involved in an incident with another prisoner and Correctional Officer (CO) Ramos.  (Doc. 36-1 at 19.) Plaintiff was referred to pre-hearing detention at 1:30 p.m.  (Doc. 36-1 at 28.)

A.     SCC Incident Reporting Policy

CoreCivic's incident reporting policy requires facility personnel to complete either a 5-1A Incident Report or a 5-1C Incident Statement.  (DSOF ¶ 54.)  A 5-1C Incident Statement is completed by all employees involved in or witnessing an incident.  (*Id.* ¶ 56.) Each involved employee is required to complete the form.  (*Id.*)  A 5-1A Incident Report is completed by the Unit Manager or on-duty Shift Supervisor or Designee.  (*Id.* ¶ 55.)  The form is a summary of the incident based on the 5-1C and information known prior to the end of the shift.  (*Id.*)  "Use of force" is considered a significant incident.  (*Id.* ¶ 58.)

If an incident involving force (either prisoner-on-prisoner or prisoner-on-officer) occurs, the Unit Manager or on-duty Shift Supervisor or Designee is responsible for "initiating the 5-1D."     (*Id.*)     The Chief of Security or Designee and the Warden/Administrator or Designee are responsible for completing the "review portion of the 5-1D report."[2]   (*Id.*)   Any use of force incident requires facility medical staff to complete a Facility Emergency Flow Sheet and Facility Emergency Anatomical Form to identify any injuries sustained as a result of the incident and all persons participating in the use of force incident.  (*Id.* ¶ 59.)

B.     SCC Restraint and Escort Policy

When officers escort a Restrictive Housing Unit (RHU) prisoner, the use of restraints is necessary to maintain the safety and security of the escorting officers, the prisoner being escorted, and other prisoners and officers who may be in the area during

---

[2] It is unclear from the evidence what "initiating the 5-1D" entails and how the 5-1D differs from a 5-1A Incident Report or a 5-1C Incident Statement.

escort.  (DSOF ¶ 68.)   Various types of restraints can be used depending on the circumstances.  (*Id.* ¶ 71.)  For example, five-point cuff restraints (both ankles, both wrists, and around the individual's waist) are only used when escorting prisoners from Restrictive Housing Units.  (*Id.*)  Otherwise, traditional wrist restraints are used.  (*Id.*)  Wrist restraints must be placed such that the prisoner's arms are placed behind his back (unless a medical condition contraindicates the same).  (*Id.* ¶ 72.)   During escort, officers are required to utilize the "escort position," which means that the restrained prisoner walks slightly in front of the officer and to the left of the officer.  (*Id.* ¶ 73.)  The officer is required to walk behind the prisoner's left arm, and in doing so, to place his left hand on the prisoner's left arm or shoulder, and his right hand on the prisoner's restrained hands.  (*Id.*)

### C.    Defendant's Version of May 6, 2020 Escort

In a Declaration, Defendant Narvaez attests to the following:

Defendant Narvaez was not present during or involved in the incident between Plaintiff, the other prisoner, and CO Ramos, which occurred prior to Defendant being called to the scene.  (Def.'s Decl., Doc. 36-2 at 3-4 ¶¶ 12, 14.)   After the altercation, Defendant was called to escort Plaintiff to the medical unit for a pre-Restrictive Housing assignment medical evaluation.  (*Id.* ¶ 16.)  Defendant Narvaez or another officer placed Plaintiff in restraints.  (*Id.* ¶ 39.)  Plaintiff informed Defendant Narvaez that he wanted to be restrained in a manner that allowed his hands to be restrained in front and not behind his back because he had "arm problems."  (*Id.* ¶ 40.)  Defendant Narvaez continued with the normal restraint position and escort.  (*Id.* ¶ 41.)  Plaintiff did not complain of pain, discomfort, or otherwise when his hands were restrained behind his back during the entire escort.  (*Id.* ¶ 42.)

Plaintiff was non-compliant during the escort.  (*Id.* ¶ 43.)  Plaintiff "kept dragging his feet" and leaning towards Defendant Narvaez with his body weight.  (*Id.* ¶ 44.)  Defendant Narvaez's escort of Plaintiff to the medical unit for the pre-restrictive housing medical evaluation likely took more than the typical five to seven minutes.  (*Id.* ¶ 45.)

Defendant and Plaintiff arrived at the medical unit at 2:40 p.m.  (Doc. 36-1 at 22.)

staff evaluated Plaintiff and completed a Facility Emergency Anatomical Form, which indicates that Plaintiff was ambulatory, and no injuries were found.  (*Id.*)  The Form also indicates that Plaintiff did not provide a statement about the "circumstances of the occurrence." (*Id.*)  Plaintiff was cleared for segregation housing at 2:48 p.m.  (*Id.*)

After the medical evaluation, Defendant Narvaez escorted Plaintiff in a wheelchair back to the Hotel Unit for reassignment to a cell in the Bravo pod (cell 65).  (*Id.*)  Defendant Narvaez transferred Plaintiff in a wheelchair because he was non-compliant with the escort to the medical unit, not because he had any injuries preventing him from being ambulatory.  (*Id.* ¶¶ 51, 53.)  Plaintiff did not complain of pain, discomfort, or otherwise during the escort from the pre-restrictive housing medical evaluation back to Hotel Unit, Bravo pod.  (*Id.* ¶ 55.)

Upon arrival at Hotel Unit, Bravo pod, Plaintiff was placed in the shower, where he submitted to a strip search.  (*Id.* ¶ 56.)  The strip search was performed without incident.  (*Id.* ¶ 57.)  After the strip search, Plaintiff submitted to hand restraints, and Defendant Narvaez escorted him to cell 65.  (*Id.* ¶ 58.)  Cell 65 is on the upper tier of the unit, which required movement up the stairs.  (*Id.* ¶ 59.)  Plaintiff tried to get hold of the guard rail while climbing the steps to the second tier of cells.  (*Id.*)  Defendant Narvaez informed him that he did not need to grab the guard rail, as Narvaez would assist him.  (*Id.*)  Halfway up the stairs, Plaintiff stopped and attempted to fall backwards.  (*Id.*)  Defendant Narvaez gained control of Plaintiff as he tried to fall backwards and continued to escort him to cell 65.  (*Id.* ¶ 60.)

Defendant Narvaez denies using any force on Plaintiff at any time from the start to the end of the escort from Hotel Unit, Charlie pod, to the medical unit, and then back to Hotel Unit, Bravo pod (Restrictive Housing); he specifically denies shoving Plaintiff forward while escorting him, pulling Plaintiff's shoulder back or unnecessarily bending Plaintiff's fingers back during escort, or mocking any alleged complaints of pain.  (*Id.* ¶¶ 35-38.)

. . . .

### D.      Plaintiff's Version of May 6, 2020 Escort[3]

In his Response, Plaintiff generally asserts that Defendant Narvaez's version of facts is false.  At the time of the May 6, 2020 incident, Plaintiff's left shoulder and right hand and wrist were badly injured.  (Doc. 48 at 2-3.)  Plaintiff also had a "reconstructed foot/ankle, torn left shoulder ligament, fractured and dislocated right hand/wrist, [and] ruptured thoracic vertebrae discs." (*Id.* at 5.)  Defendant Navarez ignored Plaintiff's "well-known[] medical records" and Plaintiff's "repeated apprisals [sic] of serious and painful injuries that handcuffing behind the back specifically causes further injury and extreme pain." (*Id.* at 2-3.)  During the escort, Plaintiff grabbed the guardrail because he was concerned that Defendant Narvaez "would attempt to possibly throw him down the stairs." (*Id.* at 4.)

### E.      Relevant Documentary Evidence

Assistant Warden Bradley signed several of Plaintiff's Confinement Reviews while he was in the RHU.  A Confinement Review is a form that identifies: (1) the type of confinement the prisoner is placed in; (2) the prisoner's detention status (i.e. disciplinary or administrative); (3) the reason for the placement (i.e. disciplinary, poses a threat to the security of the orderly operation of the facility, administrative order); and (4) any special conditions or precautions (i.e. medical or mental health conditions or medications).  (DSOF ¶ 129.)  The Confinement Review is reviewed and signed by the Chief of Security, Unit Management, or higher authority. (*Id.* ¶ 130.)  Four Confinement Reviews were completed between May 7, 2020 and August 5, 2020.  (Doc. 36-1 at 30-33.)  None of the Confinement Reviews identified any specific medical concerns or issues. (*Id.*)

A Confinement Activity Record (CAR) was also completed while Plaintiff was in the RHU.  The CAR is completed daily by correctional and medical personnel and addresses issues such as a prisoner's medication administration, restrictions, recreation, meals, commissary, special visits, and any comments and/or special instructions.  (DSOF

---

[3] Plaintiff did not file a controverting statement of facts or a separate statement of facts.

¶¶ 75, 133.)  Plaintiff's CAR was completed by medical and correctional personnel each day he was in the RHU.  (Doc. 36-1 at 35-60.)  None of the "comments/special instructions" sections of Plaintiff's CAR forms identify any injuries or issues.  (*Id.*)

**IV.   Discussion**

   **A.   Excessive Force Legal Standard**

   Use of excessive force against a prisoner violates the prisoner's Eighth Amendment right to be free from cruel unusual punishment.  *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).  The use of force is constitutional if it is used in a good faith effort to keep or restore discipline; it is unconstitutional if it is used "maliciously and sadistically for the very purpose of causing harm."  *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986).  Not "every malevolent touch by a prison guard gives rise to a federal cause of action"; thus, de minimis uses of physical force, provided that use of force is not "repugnant to the conscience of mankind," do not offend the Constitution.  *Hudson v. McMillan*, 503 U.S. 1, 9–10 (1992).

   A court considers five factors in determining whether a defendant's use of force was malicious and sadistic for the purpose of causing harm: (1) the extent of the injury, (2) the need for force, (3) the relationship between the need and the amount of force used, (4) the threat "reasonably perceived" by the officials, and (5) "any efforts made to temper the severity" of the force.  *Id.* at 7 (citing *Whitley*, 475 U.S. at 321).  When reviewing these *Hudson* factors, the court must remember that prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Whitley*, 475 U.S. at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

   **B.   Analysis**

   There are genuine disputes of material fact regarding whether and to what extent Plaintiff was injured before or during Defendant Narvaez's escort, whether any force was necessary, whether any force was used, the amount of force that was used, and the relationship between the need for force and the amount of force used.  Defendant declares that if he had been present or involved in the initial incident between Plaintiff, the other

prisoner, and CO Ramos, Defendant would have been identified in and/or completed a disciplinary report.   (Def.'s Decl. ¶ 15.)   Likewise, Defendant avers that if he had used force against Plaintiff, he would have completed a 5-1C Incident Statement, and another officer would have returned Plaintiff to the medical unit to assess whether any injury occurred during the use of force.   (*Id.* ¶ 61.)   Assistant Warden Bradley also attests that if Defendant had been involved in the initial incident on May 6, 202, Defendant would have been identified in or completed a disciplinary report, and if Defendant had used force against Plaintiff during the escort, he would have completed a 5-1C Incident Report.   (Decl. of J. Bradley, Doc. 36-1 at 9 ¶ 38; *id.* at 11 ¶ 52.)   There is no video available for the incident in the Hotel Unit or Plaintiff's escort from the Charlie pod to the medical unit for a pre-Restrictive Housing assignment medical evaluation and then to the Hotel Unit, Bravo pod RHU because there was no use of force incident complained of or reported, so the video from that day was not backed up or saved.   (DSOF  127.)

Defendant declares that he transported Plaintiff in a wheelchair to control Plaintiff's movement and ensure compliance with escort procedures, not because Plaintiff had any injuries.   (Def.'s Decl. ¶¶ 51-53.)   Defendant suggests that Plaintiff's failure to submit a grievance concerning Defendant's escort of Plaintiff indicates the incident did not occur as Plaintiff described or did not occur at all.   (Doc. 35 at 9.)

In his Response, Plaintiff contends that it is "blatantly obvious" that Defendant "would claim that 'no injuries were identified' and 'Plaintiff was cleared by the medical staff' because to do otherwise at that time would be conceding the assault which they committed."   (Doc. 48 at 4.)   Plaintiff further asserts that Defendant, in an effort to "conceal and 'explain away' the injuries" that Defendant and the officer knew they had inflicted on Plaintiff, "falsely claims that Plaintiff was placed into a wheelchair" for the escort back to Charlie Unit because Plaintiff was non-compliant.   (*Id.*)   Plaintiff alleges that Defendant "flatly lies by denying that Plaintiff complained of 'pain, discomfort, or otherwise" because if Plaintiff had complained, "then [Defendant claims he] would have suddenly acted law-

abiding and in compliance with SCC policy and had Plaintiff 'returned to the medical unit for an additional evaluation.'" (*Id.*)

Plaintiff also argues that Defendant's "admission" that Plaintiff grabbed the guardrail while climbing the stairs "plainly evidences a concern that [Defendant] would attempt to possibly throw [Plaintiff] down the stairs." (*Id.*) Plaintiff further contends that the absence of an incident report does not weigh in Defendant's favor because "'common sense' alone illuminates that, were Plaintiff so 'non-compliant' by trying to 'fall backwards,'" dragging his feet, "obstructing badly enough to warrant a wheelchair," and causing a delay in the escort to the medical unit, as Defendant claims, then "absolutely [Defendant] would have made a report and misconduct issued upon Plaintiff." (*Id.*)

Plaintiff argues that "coincidentally," the "MileStone video," which apparently would have recorded the incidents on May 6, 2020, were not preserved. (*Id.*) Plaintiff asserts that completing a 5-1-C Incident Statement "would compel preserving MileStone video surveillance." (*Id.*) Plaintiff contends that Defendant's statement regarding the unavailability of the video amounts to "admitted destruction of the video recorded incidents" because Defendant and SCC's counsel "realize that video would confirm Plaintiff's factual claims." (*Id.* at 5.)

Plaintiff asserts that he did not "have trust in reporting the abuses and assault" to Assistant Warden Bradley or any SCC staff because when Plaintiff reported the February 6, 2019 assault, "numerous SCC staff began targeting Plaintiff with retaliatory har[]assment  and targeting fraud." (*Id.*) Plaintiff contends it is "patently false" that he could have submitted a grievance "due to the threats by Warden Thomas that clearly were well as the fraudulent accusations of the May 6, 2020 incident evidence." (*Id.*)

Defendant's sworn testimony and the lack of any prison or medical documentation of the alleged incident or of Plaintiff's alleged injuries are sufficient to make an initial showing that Defendant did not use any force on Plaintiff, much less excessive force. Plaintiff's statements to the contrary in his verified complaint and in his summary judgment briefing create a genuine issue of material fact that Defendant pushed and shoved Plaintiff

when Plaintiff was already injured, even when no force was justified, causing Plaintiff severe pain and exacerbating his already serious injuries.  Plaintiff's account of what took place is direct evidence that raise a triable issue of material fact that the Court must resolve in his favor at this stage of the proceedings.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987) ("If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party.  The nonmoving party's evidence must be taken as true"); *see also McLauglin v. Lui*, 849 F.2d 1205, 1208 (9th Cir. 1988) (the nonmoving party's sworn statements on a central fact in dispute are direct evidence that preclude summary judgment); *c.f. Robichaud v. Theis*, 858 F.2d 392, 394 (8th Cir. 1988) (upholding a jury award for the plaintiff where the defendant had introduced medical records to show the plaintiff was a hypochondriac who exaggerated her injuries, finding "the jury is the appropriate body to determine the veracity of opposing claims.").

This is a quintessential case of factual disputes whose resolution depends on credibility determinations that can only be decided by a jury.  *Anderson*, 477 U.S. at 255 ("Credibility determinations . . . are jury functions.")  Because the Court cannot make such credibility determinations at the summary judgment stage, it will deny Defendant's Motion for Summary Judgment.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendant's Motion for Summary Judgment (Doc. 35) and Defendant's Motion to Withdraw (Doc. 53).

(2)     Defendant's Motion to Withdraw (Doc. 53) is **granted**.

(3)     Defendant's Motion for Summary Judgment (Doc. 35) is **denied**.

(4)     This action is referred by random lot to Magistrate Judge Alison S. Bachus for the purpose of conducting a settlement conference.

(5)     Defendant's counsel must arrange for all parties to jointly contact the chambers of Magistrate Judge Alison S. Bachus at 602-322-7610 within 14 days of the date of this Order to schedule a settlement conference.

Dated this 5th day of September, 2023.

James A. Teilborg
Senior United States District Judge